IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO.: _____

| | | |
|---|---|---|
| G.G., by and through her parents, | ) | |
| and guardians, DAVID GIRARDEAU, and | ) | |
| CAROLINE GIRARDEAU, | ) | |
| Plaintiffs, | ) | |
| | ) | COMPLAINT |
| v. | ) | |
| | ) | |
| THE SALEM ACADEMY AND | ) | |
| COLLEGE, | ) | |
| Defendant. | ) | |

(Jury Trial Demanded)

<u>INTRODUCTION</u>

This federal civil rights complaint is brought by Caroline Girardeau and David Girardeau on behalf of their minor daughter, Gabrielle Girardeau ("G.G."), against Salem Academy. The plaintiffs allege that Salem Academy has engaged in discriminatory practices in violation of federal civil rights laws, including but not limited to the Americans with Disabilities Act ("ADA") 42 U.S.C. § 12181 *et seq.* and Section 504 of the Rehabilitation Act ("Section 504"), 29 U.S.C. § 794. This complaint seeks to address the systemic failures of Salem Academy to provide reasonable accommodations for G.G.'s disabilities, resulting in significant educational and emotional harm.

The plaintiffs contend that Salem Academy's actions and omissions have denied G.G. equal access to educational opportunities and have subjected her to discriminatory treatment based on her disabilities. This complaint seeks declaratory and injunctive relief, as well as compensatory damages, to rectify the injustices suffered by G.G. and to ensure compliance with federal civil rights obligations by Salem Academy.

1

<u>PARTIES</u>

1.  Plaintiff, G.G., a minor, is a citizen and resident of Pittsboro, Chatham County, North Carolina and is a qualified individual with a disability as defined under 42 U.S.C. § 12102(1).

2.  Plaintiff, Caroline Girardeau ("C.G."), is G.G.'s mother, and a citizen and resident Pittsboro, Chatham County, North Carolina. She is bringing this action on behalf of her daughter and herself.

3.  Plaintiff, David Girardeau ("D.G."), is G.G.'s father, and a citizen and resident Pittsboro, Chatham County, North Carolina. He is bringing this action on behalf of his daughter and himself.

4.  C.G. and D.G. are collectively referred to herein as "the parents".

5.  Defendant, The Salem Academy and College ("Defendant" or "Salem Academy") is a private school located in Winston Salem, Forsyth County, North Carolina and is a place of public accommodation as defined by 42 U.S.C. § 12181(7).

<u>JURISDICTION AND VENUE</u>

6.  This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 as this action arises under federal law, namely the ADA and Section 504. and raises a federal question.

7.  The Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and (4), which provide for jurisdiction in civil rights cases.

8.  Moreover, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

9.  This Court has personal jurisdiction over the defendant, Salem Academy, as it is an educational institution operating within the state and is subject to the laws and jurisdiction of this state.

2

10. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b), because Defendant, Salem Academy, is located within the district, and a substantial part of the events or omissions giving rise to the claims occurred within this district.

STATEMENT OF FACTS

11. G.G. is a person and student with documented disabilities that qualify her for protections under the ADA and Section 504.

12. G.G. has disabilities that substantially limit one or more of her major life activities, including, *inter alia*, learning, thinking, communicating, focusing, and social perspective-taking.

13. Specifically, G.G. has been diagnosed with attention deficit hyperactivity disorder ("ADHD"), Oppositional Defiant Disorder ("ODD"), Autism Spectrum Disorder ("Autism") and Anxiety.

14. In April 2023, G.G. began researching Salem Academy.

15. Upon information and belief, "Salem Academy is the nation's only all-girls boarding and day high school with a STEAM [science, technology, engineering, the arts and mathematics] focus located on a college campus. [Its] rigorous college preparatory curriculum combined with individualized support and a welcoming, supportive learning community, results in life-long success."[1]

16. From April 2023 through January 2024, G.G. worked hard to meet the rigorous admission standards of the school. She told her parents that admittance into Salem Academy was her dream.

17. On or about January19, 2024, G.G. applied for admission to Salem Academy.

18. On or about January 29, 2024, G.G. learned that she was admitted to Salem Academy.

---

[1] Salem Academy Website – Overview, https://salemacademy.com/about/overview/ (last visited January 17, 2025).

19. On or about January 30, 2024, G.G. was informed that she was being considered for The Sisters Merit Scholar Award which a prestigious, four-year scholarship which covers 100% of the cost of s student's academic tenure at Salem Academy, including tuition, room, and board. The Award is given to one entering freshman per year. In addition to the financial award, the student also receives preferential honors internships in leadership and service opportunities in the greater Winston-Salem community.[2]

20. On or about February 21, 2024, G.G. learned that she was awarded the scholarship.

21. On or about August 1, 2024, the parents were required to complete a litany of paperwork which included information about G.G.'s medical diagnoses.

22. On or about August 1, 2024, the parents provided the school with documentation of G.G.'s ODD, Anxiety, and ADHD diagnoses, and requested accommodations to support G.G. educational needs in light of her disabilities.

23. On or about August 1, 2024, the parents also provided the school with information about G.G.'s prescriptions medications, what they were for, how they were to be administered, and their potential side effects as follows:

| Medication Name | Dosing | Purpose | Side Effects[3] |
|---|---|---|---|
| Lithium Carbonate | 600mg Twice Daily | ODD | Hypothyroidism, increased thirst, blurred vision, diarrhea, dizziness, drowsiness, confusion, abdominal pain, and more |
| Dexmethylphenidate ER | 5mg in the morning | ADHD | Stimulant Appetite loss Dizziness Irritability Irregular Heartbeat |
| Clonidine | 0.1mg | Before Bedtime for Sleep | Drowsiness Low blood pressure Dry Mouth Dizziness |

---

[2] Salem Academy Scholarships, https://salemacademy.com/admission/scholarships (last visited March 25, 2025)
[3] The side effects listed are common side effects but are not an exhaustive list of possible side effects.

| | | | Delirium<br>Delusional Perception<br>Hallucinations |
|---|---|---|---|
| Tizanidine | 2mg | Before Bedtime for Sleep | Drowsiness<br>CNS Depression<br>Low blood pressure<br>Hallucinosis/Psychotic-like symptoms |
| Sulfacetamide 10% lotion | Apply to Buttocks as Needed | For Folliculitis Rash | Skin Rash or Irritation |
| Alprazolam | 1mg as needed; may repeat dose in 2 hours | Acute Anxiety | Drowsiness<br>Central Nervous Systems (CNS) Depression |

24. On or about August 14, 2024, G.G. moved into Defendant's on-campus housing.

25. On or about September 15, 2024, C.G. requested accommodations for Plaintiff to receive her morning medication later on weekends to allow her to get more sleep.

26. On or about September 22, 2024, Plaintiff sent a "reel" to an upperclassman. The upperclassman advised that she was not comfortable with the contents of the reel. Plaintiff immediately acknowledged her peer's feelings and apologized for sending the message. The peer responded by text, "its okay just wanted to let you know:)."[4]

27. On or about September 26, 2024, Dean of Students Nicole Gatto and Academy Resident Life Coordinator Kaylla Richardson met with G.G. and talked about students and teachers noticing "unwanted physical actions" by G.G. against other students.

28. Ms. Gatto told G.G. to "just don't do it…" but did not mention administration concerns of sexual assault. Ms. Gatto stated that she and Ms. Richardson wanted to support G.G.

---

[4] Reels are "short videos you can easily create and enjoy watching on Instagram." Instagram, About Instagram Reels (last visited April 10, 2025)

29. On or about September 27, 2024, G.G.'s psychiatrist commented that she appeared tired to him. C.G. requested accommodations for Plaintiff to receive her morning medication later on weekends to allow her to get more sleep. This request was initially met with an almost two-week delay and resistance.

30. On or about September 28, 2024, C.G. provided a letter to Ms. Gatto from G.G.'s psychiatrist stating that it would be permissible to give G.G. her morning medication by 12pm (noon) on Saturdays and Sundays to provide G.G. more time to rest.

31. On or about September 30, 2024, the Defendant proposed that G.G. wake up at 9:00 a.m. to take her medication and then return to sleep. C.G. explained that this was not feasible due to the stimulant nature of G.G.'s ADHD medication, which would prevent her from going back to sleep.

32. On October 4, 2024, G.G.'s parents sent a formal complaint to Ms. Gatto and Head of School Kris Sorrells detailing the ongoing issues and requesting immediate action.

33. On October 6, 2024, further documentation outlining G.G.'s account of the allegations was sent to Ms. Sorrells and Ms. Gatto.

34. The response from Salem Academy was inadequate. Ms. Gatto communicated her understanding of seven allegations of G.G.'s misconduct by email later on October 6, 2024

35. Defendant eventually agreed to adjust the weekend medication schedule but noted potential limitations on Sundays due to activities.

36. Despite the initial requests, Defendant failed to implement the necessary accommodations for G.G. Defendant's failure to adjust G.G.'s morning medication administration on weekends resulted in G.G. experiencing significant fatigue, educational setbacks, and emotional distress.

37. On or about October 7, 2024, around 9:00 p.m. or 9:30 p.m., G.G. was given her evening medications: Lithium 600mg, Clonidine 0.1mg, and Tizanidine 2mg. These medications cause G.G. to become drowsy and to experience short-term memory loss approximately thirty (30) minutes after taking them.

38. Shortly before her 10:00 p.m. nightly room check, G.G. went into the communal kitchen to prepare a snack. G.G. was cutting chicken into bite sized pieces when she realized she had to return to her room for room check. She was not thinking clearly due to the medication.

39. In her haste to report back to her room before night check, she forgot whether she left the knife in kitchen or had taken it with her back to the room. G.G. reported back to her room and went to sleep.

40. On or about October 8, 2024, around 10:30 a.m., G.G.'s friend and classmate B.V. informed her that members of Defendant's Residence Life and/or Administration were conducting room searches of the students' rooms.

41. G.G. had previously mentioned to B.V. that she could not recall where she left the knife that she used to prepare her snack the prior evening, and expressed concern that she may have taken it back to her room.

42. Later that evening, before 7:00 p.m., Ms. Richardson and Deaona Watkins, a dorm assistant, reported to G.G.'s room, and instructed her to leave the room while they conducted a room search for the knife.

43. G.G. texted B.V. in disbelief that her room was being searched.

44. After a thorough search that lasted nearly twenty (20) minutes, and finding no knife or other contraband, Ms. Richardson and Ms. Watkins allowed G.G. to reenter her room. Ms. Richardson told G.G. that she was "all good".

45. Around 10:00 p.m., Ms. Richardson knocked on G.G.'s door and requested that she report to Ms. Gatto's office. G.G. complied with Ms. Richardson's request.

46. When G.G. arrived, Ms. Gatto questioned G.G. intently about the facts concerning the knife.

47. G.G., in an altered mental state due to her nightly medication having already been administered, informed Ms. Gatto that she could not remember the details sufficiently to answer her questions.

48. Ms. Gatto alleges that during this conversation, or a similar one, G.G. confessed to having touched other girls inappropriately and that she notified G.G. that her behavior was interpreted to be sexual assault. However, mention of allegations of sexual assault were not communicated to G.G. or to the parents until the day of dismissal, October 11, 2024.

49. Ms. Gatto asked G.G. to leave her office around 10:30 p.m. so that she could speak with D.G.

50. During her call with D.G., Ms. Gatto asked D.G. to come on campus the next day to talk. Ms. Gatto said that "there were concerns", but reassured D.G. that G.G. was not in trouble.

51. She stated that, as a byproduct of the parents coming on campus on October 9th, the school wanted to send G.G. home early for Fall Break, which was slated to begin on October 11, 2024.

52. Ms. Gatto explained that she and the parents would talk more during the in-person meeting the next day.

53. Ms. Gatto also stated via email, "This will give us the opportunity to get a release in place for [G.G.]'s psychiatrist and Mrs. Harrington, our school counselor and implement support resources for a safety plan for [G.G.]".

54. After speaking with D.G., Ms. Gatto summoned G.G. again. She notified G.G. that there would be another meeting on October 9, and that G.G. would be going home early for fall break.

8

55. Around 11:30 p.m. on October 8, 2024, Ms. Gatto emailed all the parents of the students currently enrolled at Salem Academy the following message:

> Dear Saber Parents,
>
> Some of you may or may not be aware, there have been a couple of rumors and allegations swirling this week. Mrs. Sorrells, myself and our diligent residence life team have been actively working to sort through what we are hearing.
>
> We want to ensure all parents that creating a warm, accepting and safe environment for all of our students remains our top priority. At this time, we also want to reassure all parents that your students are cared for and safe.
>
> If you have any questions or concerns, please reach out.

56. At approximately 11:45 p.m., Ms. Gatto emailed the parents the following message:

> Hi [C.G.],
>
> I ended up coming to campus to address some continuing matters. I spoke to [G.G.] with Ms. Richardson present to make sure that [G.G.] was feeling supported as we worked to create a plan of action to address all matters. I ended up speaking to [D.G.] since I know you are on a work trip in California.
>
> The plan right now to make sure that we can address issues (including a meeting I am holding on Friday to address "mean girl" behavior from the freshman class) as well as create a safety plan for [G.G.] is for [D.G.] to pick [G.G.] up tomorrow between 9:30-10:00 so [G.G.] can start break early.
>
> This will give us the opportunity to get a release in place for [G.G.'s] psychiatrist and Mrs. Harrington, our school counselor and implement support resources for a safety plan for [G.G.]
>
> [D.G.] shared with me that [G.G] was struggling with suicidal ideations (which [G.G.] confirmed and shared that they had been happening for a long time but that she had never created a plan) and because of that we want to ensure that we have appropriate supports put in place.[5]
>
> [G.G.] did admit to being physical with other students in our conversation and stated clearly that she didn't trust Ms. Richardson or myself because we would have to share with other adults.

---

[5] In October 2023 an Emergency Plan was created for G.G.

When I asked [G.G.] who, she explained that she did not want me to share with you. I explained to her that because she is a minor, we are obligated to share with parents but that we all wanted to be on the same page for what is best for her.

I let [D.G.] know that I would be available whenever he got to campus to talk in person and make sure that we could all move forward in the best way possible.

If you have any questions, please feel free to reach out.

57. Due to the interrogations and meetings called by Ms. Gatto, G.G. missed tests without clear direction about when she could make them up.

58. On or about October 8, 2024, at around 8:54 p.m., C.G. emailed Ms. Gatto and requested that the meetings be moved to allow G.G. to complete academic work. Ms. Gatto emailed back that evening and advised that "we will make sure that all of [G.G.]'s work is made up". The meetings took precedence and G.G. missed timed essay tests and other school deadlines.

59. On or about October 9, 2024, D.G. drove to Salem Academy to meet with G.G., Ms. Gatto, and Head of School Kris Sorrells. Ms. Gatto communicated the list of accusations that had been raised by other students and adults at the school.

60. Ms. Sorrells and Ms. Gatto agreed to work with G.G. and resolve the current situation.

61. Defendant elected to dismiss G.G. three (3) days early for Fall Break.

62. As a result, G.G. missed four days of instruction with no plan or follow through from the school on how she could make up the work.

63. On or about October 10, 2024, school counselor Amber Harrington emailed C.G. and D.G. a copy of the Health Release of Information form for the parents to sign to grant permission for Ms. Harrington to speak to G.G.'s psychiatrist.

64. Given that C.G. was traveling for work, Plaintiffs were unable to get the form completed.

65. On or about October 11, 2024, the parents received a phone call and the following email from Ms. Sorrells:

[D.G.] and [C.G.],

Attached, please find the formal dismissal letter from Salem Academy pertaining to [G.G.]
We will remain in touch regarding the collection of [G.G.'s] items as well as assisting in the
necessary documentation to transition [G.G.] to a different school.

If you have any additional questions, please let us know.

Thank you.

66. On or about October 12, 2024, Plaintiff G.G. and her parents attended a psychiatrist appointment with Tian Duke-Sui, MD of Family Psychiatry Practice and Associates in Cary, North Carolina. Dr. Duke-Sui questioned G.G. about the allegations of sexual assault and analyzed her recount of the facts.

67. Dr. Duke-Sui informed the parents that G.G.'s account of what happened on the campus of Salem Academy did not constitute sexual assault or sexual harassment. He described it as a "misunderstanding".

68. G.G. explained that the activity which was misinterpreted to be sexual assault pertained to "a stair game" which multiple students engaged in, on a staircase within the Salem Academy dormitory.

69. Two students would walk side-by-side up a flight of stairs, and they would place their hands on each other's backs, with their fingers pointed toward the ground. The two students walked up the stairs in tandem, and would apply pressure to the palm of their hand. They used their feet to try to throw their partner, or opponent, off balance, possibly causing them to fall.

70. The staircase was three floors high. If one student walked up the next stair ahead of their opponent, then the hand, with fingers pointing down, could possibly cross the waistline of the other girl.

71. Embellishment by her peers may have led them to communicate that G.G. was inappropriately touching them, or "putting her hands down people's pants".

72. G.G. communicated that multiple girls consented to play this game in pairs, and the game was played on multiple days in September 2024.

73. G.G., being competitive, was possibly aggressive in playing this game, which may have antagonized other girls with whom she played.

74. Defendant failed to follow the policies and procedures outlined in its handbook regarding the sexual harassment or assault allegations against G.G., nor did it follow the policies and procedures outlined in the handbook with regard to expelling dismissing G.G.

75. Defendant never communicated prior to the October 11 call to D.G. that G.G. was being investigated for sexual harassment or assault.

76. Neither G.G. nor her parents ever received a written report from the school concerning any of the behavior incidents or allegations that presumably led up to Defendant expelling G.G., despite C.G. explicitly asking for the same on October 4, 2024.

77. On or about October 13, 2024, G.G. reported to C.G., that while she was in Defendant's school, she felt anxious and experienced memory loss due to the level of interrogation and stress that she experienced while living at Salem Academy.

78. In the immediate weeks after the dismissal., G.G. disclosed to her parents after the dismissal that she felt so negatively interrogated by Ms. Gatto in conversations leading up to the supposed sex assault confession, that she admitted to Ms. Gatto's false allegations out of fear and anxiety.

79. The continuous questioning over multiple days left G.G. beat down and unable to advocate or defend herself. She was not aware that she was indirectly admitting to sexual assault.

80. Throughout G.G.'s time at Salem Academy, her parents engaged in numerous communications with school officials to address the lack of accommodations and allegations of misconduct based on evidence manipulated and/or taken out of context.

81. Salem Academy's actions were in direct violation of their own policies, as outlined in the Student-Family Handbook, which explicitly states that the school is committed to providing accommodations for students with disabilities; yet these commitments were not upheld in G.G. case.

82. As a result of Salem Academy's failure to accommodate G.G.'s disabilities, G.G. suffered academically and emotionally.

83. Salem Academy's dismissal of G.G. due to manifestations of her disabilities has had, and continues to have, an adverse impact on her education, physical health, mental health.

84. G.G.'s dream of attending Salem Academy was extinguished, she lost a four-year scholarship, and went more than a month without any academic instruction. Disclosure of the Salem Academy dismissal created significant delays in facilitating her placement in a local high school in Chatham county. The application to attend high school in the Chatham County School District was submitted on October 16, 2024. Her dismissal from Salem Academy had to be disclosed on the public school application.

85. On or about October 23, 2024, Chatham County School Administrators reached out to Salem Academy to research the nature of G.G.'s dismissal. C.G. was told by a Chatham County School employee that attempts to reach Salem Academy representatives, including Ms. Gatto, Ms. Jessica Rogers, Director of Enrollment Management, and Ms. Sorrells, had not been successful. It took several attempts before Salem Academy communicated and agreed to make contact with Chatham County school officials.

13

86. On or about October 28, 2024, C.G. received a phone call from Chris Blice, Assistant Superintendent of Chatham County Schools. He communicated that G.G.'s dismissal from private school was interpreted to be equivalent to a long-term suspension by Chatham County School Administrators.

87. G.G. was initially denied in-person admission into Chatham County Public Schools due to her dismissal from Salem Academy.

88. On or about October 30, 2024, G.G. and the parents met with Chatham County School Administrators in person to discuss a plan for entry into the school system.

89. Chatham County Schools would not allow her to attend in-person education. Rather, she was offered enrollment into virtual learning, through the ONE Academy. She was also offered future in-person enrollment into her local high school beginning Spring semester, which commenced January 23, 2025.

90. Virtual instruction has always been a challenge for G.G., particularly in light of her ADHD diagnosis. Observations of inattention and lack of focus were first made in an on-line learning environment during the COVID pandemic. However, left with no alternative, G.G. was forced to enroll an online educational program called "ONE Academy." If G.G. did not enroll in the program, she would have had no hope for completing her ninth-grade year on time.

91. The curriculum for the online program was asynchronous. As a result, G.G. could not ask questions or get clarity on her assignments without requesting or attending weekly office hours. In essence, G.G. had to teach herself World History, Math 1, English 1, Spanish 1, and Health and P.E.

14

92. Due to her untimely dismissal, G.G. lost the opportunity to perform in the main cast of Salem Academy's Fall theatre production and to participate in the Winston-Salem Youth Philharmonic as a trumpeter.

93. Plaintiff C.G. also experienced severe emotional distress as a result of her discriminatory dismissal from Salem Academy. Specifically, G.G. experienced, *inter alia*, the following:

   a. Decreased self-confidence;

   b. Decreased self-esteem;

   a. Increase stress;

   b. Increased anxiety and the development of a hand tremor;

   c. Feelings of isolation and loneliness due to lack of in-person social interaction with school peers;

   d. Increased irritability

   e. Insomnia and/or hypersomnia;

   f. Memory loss and confusion

   g. Grief about lost opportunities;

   h. Increase in appointments with her psychiatrist and licensed clinical social worker;

   i. Distrust; and

   j. Fear of forming new friendships.

94. Plaintiffs C.G. and D.G. also experienced severe emotional distress, including, *inter alia*:

   a. Insomnia;

   b. Grief at the loss of opportunities for G.G.; and

   c. Anxiety from the trauma, loss, and powerlessness over the dismissal decision.

15

95. On or about January 24, 2025, G.G. began attending, and currently attends, Seaforth High School in Pittsboro, Chatham County, North Carolina.

96. Since resuming in-person learning, G.G. has experienced an elevated degree of social anxiety, requiring the changes to her medication regimen.

97. Even with adjustments to her medications, G.G. continues to be anxious about how she is perceived by others and is reluctant to attempt to make friends. She has a fear that other kids in her class will think she is a "psycho" or a "failure" if they find out what happened at Salem Academy.

98. In or about April 2025, G.G. was reevaluated for was reevaluated for Autism, and met the criteria for Autism.

99. Before the dismissal, G.G. was a very out-going individual. Now, she is unwilling to participate in activities that you used to bring her joy, like acting and music, for fear that she will say or do something wrong.

CLAIMS FOR RELIEF

COUNT I: VIOLATION OF THE AMERICANS WITH DISABILITIES ACT
(42 U.S.C. § 12101 *ET. SEQ.*)

100. Plaintiffs restate and reallege the foregoing allegations, and incorporate the same, by reference, as though fully set forth herein.

101. Salem Academy has violated Title III of the ADA, which prohibits discrimination against individuals with disabilities in places of public accommodation, including educational institutions.

102. By failing to provide reasonable accommodations for G.G.'s documented disabilities, Salem Academy has denied her equal access to educational opportunities and subjected here

16

to disparate treatment based on her disabilities, thereby discriminating against G.G. based on her disability status.

103.    While Defendant eventually made some adjustments, the delay and partial nature of the accommodations failed to meet the ADA's standards for ensuring equal access to public accommodations.

104.    The ADA requires that individuals with disabilities be treated fairly and provided with appropriate support during disciplinary or investigative processes.  Defendants did not afford G.G. any procedural safeguards during Defendant's interrogations, particularly when she was under the influence of medication.

105.    The parents reported that Plaintiff was being bullied and that Defendant's actions, or lack thereof, created a hostile and intimidating environment.

106.    Defendant's failure to follow its own policies, as outlined in its handbook, further demonstrates Defendant discriminated against Plaintiff on the basis of her disabilities.

107.    As a direct and proximate result of Salem Academy's actions or omissions, Plaintiff, G.G., has suffered injury including emotional distress, educational harm, and other losses in excess of one-hundred thousand dollars and no cents ($100,000.00) in an amount to be proven at trial.

### COUNT II: VIOLATION OF SECTION 504 OF THE REHABILITATION ACT
### (29 U.S.C. § 794)

108.    Plaintiffs restate and reallege the foregoing allegations, and incorporate the same, by reference, as though fully set forth herein.

109.    Salem Academy receives federal financial assistance and is therefore subject to the requirements of Section 504 of the Rehabilitation Act.

110.    Salem Academy discriminated against G.G. on the basis of her disabilities by failing to provide reasonable accommodations and by subjecting her to discriminatory treatment.

17

111. As a direct and proximate result of Salem Academy's actions, G.G. has suffered injury including, *inter alia*, severe distress, educational harm, and other losses.

112. Due to Salem Academy's actions or omissions, Plaintiff, G.G., has suffered injury including emotional distress, educational harm, and other losses in excess of one-hundred thousand dollars and no cents ($100,000.00) in an amount to be proven at trial.

### COUNT III: FAILURE TO ADHERE TO INSTITUTIONAL POLICIES

113. Plaintiffs restate and reallege the foregoing allegations, and incorporate the same, by reference, as though fully set forth herein.

114. Salem Academy's actions are in direct violation of its own policies, as outlined in the Student-Family Handbook.

115. These policies explicitly commit to providing accommodations for students with disabilities, yet Salem Academy failed to uphold these commitments in G.G.'s case, further contributing to the discriminatory treatment she experienced.

116. Due to Salem Academy's actions or omissions, Plaintiff, G.G., has suffered injury including emotional distress, educational harm, and other losses in excess of one-hundred thousand dollars and no cents ($100,000.00) in an amount to be proven at trial.

### COUNT IV: NEGLIGENCE

117. Plaintiffs restate and reallege the foregoing allegations, and incorporate the same, by reference, as though fully set forth herein.

118. Defendant is an institution that is in the business of providing educational services to minor students.

119. Defendant owed G.G. a duty of care. Specifically, Defendant had a duty to ensure G.G.'s health and safety, which included providing necessary health services and ensuring that the

18

environment is free from hazards. Moreover, Defendants had a duty to provide a safe and supportive environment that addressed G.G.s unique needs, including her special health needs.

120.    Defendant breached the duty of care it owed to G.G. when it failed to inquire or address manifestations of G.G.s real or perceived disabilities. Defendant neglected to provide social emotional instruction, support or guidance when G.G. exhibited unusual behavior. Defendant's actions toward G.G. were overwhelmingly punitive and not designed to ensure that she had equal access to their program.

121.    Moreover, despite numerous communications from the parents regarding the lack of accommodations, Salem Academy failed to adequately address these concerns, demonstrating negligence in its duty to provide a non-discriminatory educational environment.

122.    This negligence has exacerbated the harm suffered by G.G., both academically and emotionally.

123.    As a result of Defendant's breach of the duty of care, G.G. suffered, *inter alia*, severe emotional distress, ridicule, embarrassment, shame, and increased physical manifestations related to anxiety including insomnia and hand tremors.

124.    It was reasonably foreseeable that a student with disabilities, which include communication differences, would suffer significant harm if she was singled out for engaging in the same behavior as her neurotypical peers (e.g. participating in the stair game), accused of violating Defendant's Code of Conduct, forced to leave early for Spring break, and accused of inappropriate behavior towards her peers.

125.    At no time did Defendant's offer mental health counseling or other service to assist G.G. with her communication challenges.

126. Instead, Defendant determine that did not want G.G. as a student at the school anymore and unilaterally terminated her enrollment without any due process.

127. As a result of Defendant's actions as alleged herein, G.G. did, in fact, significant physical, emotional, mental and financial harm.

128. G.G. has suffered damages, including emotional distress, educational harm, and other losses in excess of one-hundred thousand dollars and no cents ($100,000.00).

<u>COUNT V: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS</u>

129. Plaintiffs restate and reallege the foregoing allegations, and incorporate the same, by reference, as though fully set forth herein.

130. G.G. is a person with disabilities. Prior to her enrollment with defendant, G.G. was diagnosed with Autism Spectrum Disorder, ADHD, and ODD.

131. C.G. and D.G. disclosed G.G.'s disabilities to Defendant.

132. Prior to her enrollment with Defendant, G.G. generally masked her disabilities with the exception of communication challenges and maintaining meaningful friendships.

133. G.G. demonstrated impeccable scholarship and potential, hence the reason Defendant's awarded her the prestigious Sister's Award.

134. When G.G. began exhibited unusual behavior at school, Defendant reached out to the parents to inquire about what may be going on with G.G. While Defendant stated that they wanted to support G.G., there were significant delays and little demonstration of creating and implementing strategies or interventions that would accommodate her disabilities. It took until October 5, 2024 to implement a later medication administration time on weekends to allow G.G. more sleep. This accommodation was implemented 4 days before she was asked to leave Salem Academy for an early Fall break. A request to speak with G.G.'s psychiatrist was made

on October 10th, but time was not allowed to process the paperwork or converse with the psychiatrist prior to dismissal on October 11th.

135.    Instead, Defendant immediately became punitive and disproportionately punished G.G. for her behavior, all of which was either a manifestation of her disabilities, or an embellishment by her peers.

136.    Defendant was negligent as explained in Count III herein. It was foreseeable that Defendant's negligence, as described herein, would cause G.G. emotional distress.

137.    Defendant failed to take any action to lessen the impact of its actions and/or omissions on G.G.

138.    As a result of Defendant's negligence, G.G. suffered severe emotional distress as described herein.

139.    As a direct and proximate result of Salem Academy's actions, G.G. has suffered injury including, *inter alia*, severe distress, educational harm, and other losses.

140.    Similarly, Defendant were negligent with their duties to C.G. and D.G.; specifically, Defendant failed to ensure G.G.'s health, safety, and welfare while she was attending the school and living on the campus.

141.    As a result of Defendant's failure, the parents were called to pick up G.G. in the middle of the night under the auspice of G.G. going on Spring Break early.  Thereafter, the parents were informed that G.G. was not to return.

142.    Defendant's actions toward G.G., and C.G. and D.G. individually, caused both C.G. and D.G. to suffer severe emotional distress as exhibited by new physical, emotional and mental health symptoms, and exacerbation of prior medical conditions.

143. Due to Defendant's actions or omissions, C.G. and D.G. are entitled to recover damages in an amount exceeding one-hundred thousand dollars and no cents ($100,000.00).

<u>COUNT VI: BREACH OF CONTRACT</u>

144. Plaintiffs restate and reallege the foregoing allegations, and incorporate the same, by reference, as though fully set forth herein.

145. C.G. and D.G. entered into a contractual relationship with Defendants wherein Defendant agreed to educate G.G., provide housing and educational opportunities in exchange for payment of tuition.

146. G.G. was awarded a scholarship, the proceeds of which satisfied the parents financial obligations to Defendants.

147. Defendants agreed to provide educational services that would "support any student with a diagnosed disability" to include providing reasonable accommodations.

148. Defendant neither provided G.G. with support for her disabilities, nor provided G.G. with reasonable accommodations.

149. As a result of Defendant's failure to provide the agreed upon educational services to G.G, she was disenrolled from the program.

150. Plaintiffs suffered irreparable harm as a result of Defendant's breach of contract.

151. Plaintiffs are entitled to recover damages in an amount exceeding one-hundred thousand dollars and no cents ($100,000.00).

PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests this court grant relief as follows:

1. Declare that Salem Academy's actions and omissions violated the ADA;

22

2. Declare that Salem Academy's actions and omissions violated Section 504 of the Rehabilitation Act;

3. Declare that Salem Academy's actions and omissions resulted in disability-based discrimination against G.G.;

4. Issue an an injunction requiring Salem Academy to implement appropriate policies and procedures to ensure compliance with federal civil rights laws, including the provision of reasonable accommodations for students with disabilities;

5. Award Plaintiffs compensatory damages for the educational and emotional harm suffered by G.G., and her parents, as a result of Salem Academy's discriminatory practices.

6. Award Plaintiffs' reasonable attorneys' fees and costs incurred in this action , pursuant to 42 U.S.C. § 1988 and other applicable laws; and

7. Grant such other and further relief as the Court deems just and proper to address the violations and harm suffered by Plaintiffs.

JURY DEMAND

Plaintiffs hereby request a trial by jury.

Respectfully submitted, this the 9th day of June, 2025.

THE LAW OFFICE OF NEUBIA L. HARRIS, PLLC,

By: /s/ Neubia L. Harris
   Neubia L. Harris
   N.C. State Bar No.: 42069
   312 W. Millbrook Road, Suite 141
   Raleigh, NC 27609
   (919) 526-0500 (telephone)
   (919) 589-3935 (facsimile)
   Email: neubia@neubiaharrislaw.com
   *Attorney for Plaintiffs*